1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BITE TECH, INC. and BTFM HOLDING, INC.,

Plaintiffs,

v.

X2 IMPACT, INC.,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.     In May 2011, Bite Tech and defendant X2 Impact ("X2") entered into a Technology License Agreement (the "Agreement") to jointly develop a revolutionary impact-sensing mouthguard that would enable real-time monitoring of impact forces in amateur and professional athletes, military and combat troops, and others at risk of concussions or similar harms.  The mouthguard became known as the BTX2 and has the potential to allow sports team managers, trainers, doctors or others to monitor and, as a result of receiving the impact data, to be in a position to act to prevent further and perhaps more dangerous head injuries in amateur and professional athletes.  In the Agreement, X2 agreed to provide Bite Tech a "exclusive worldwide license" to X2's impact-sensing technology.  Bite Tech agreed to make eight monthly "advance royalty payments" totaling two million dollars ($2,000,000) and to share in the net profits derived from any product that incorporated the licensed technology.

COMPLAINT- 1

LANE POWELL pc
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON  98101-2338
206.223.7000 FAX: 206.223.7107

2.    Shortly after the Agreement was executed, X2 began to regret the exclusive license it granted to Bite Tech and began searching for ways to escape from the Agreement. Without communicating to Bite Tech that it planned to terminate the Agreement, X2 continued to accept the monthly $250,000 advance royalty payments from Bite Tech through January 2012.  Then, shortly after Bite Tech completed making advance royalty payments totaling $2,000,000, in March 2012, X2 purported to terminate the Agreement.  Although the BTX2 was not finished and none had been sold as of the date X2 purported to terminate the Agreement, X2 refused Bite Tech's demand for the return of the $2,000,000 in advance royalty payments.

3.    Not only has X2's wrongful conduct damaged Bite Tech, it also has harmed untold numbers of amateur and professional athletes who would benefit from the BTX2.  As a result of X2's wrongful termination of the Agreement, and its cupidity, the BTX2's launch has been significantly delayed, if it launches at all, and therefore a significant number of athletes, military personnel and others will be deprived of the potentially life-saving benefits of the product.

## THE PARTIES

4.    Bite Tech is, and at all times relevant hereto has been, a Minnesota corporation with its principal place of business in Greenwich, Connecticut.

5.    BTFM Holding, Inc. is, and at all times relevant hereto has been, a Delaware corporation with its principal place of business in Greenwich, Connecticut.  BTFM Holding, Inc. is the successor to the portion of Bite Tech's business that related to the development of the BTX2 and the relationship with X2.  Accordingly, unless otherwise specified, Bite Tech and BTFM Holding, Inc. will be referred to collectively throughout this Complaint as "Bite Tech."

6.    X2 is, and at all times relevant hereto has been, a Washington corporation with its principal place of business in Seattle, Washington.

COMPLAINT- 2

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs and there is diversity of citizenship between the parties.

8.    Venue is proper in the Seattle Division of the Western District of Washington pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

9.    Bite Tech is a technology company that focuses on the creation and development of performance mouthwear products designed to increase the performance and safety of its users.  Bite Tech's products are used by athletes in virtually every major sport around the globe and the company holds 45 patents and patent applications pertaining to mouthguards.

10.    X2 is a corporation that focuses on the development of impact-sensing products that are designed to measure the concussive forces sustained by its users and wirelessly conveying that data to devices where it can be monitored.

11.    In May 2011, the parties entered into the Agreement, a true and correct copy of which is attached hereto as Exhibit A.

12.    Under the Agreement, Bite Tech was granted "an exclusive worldwide license . . . under which Licensee shall have the exclusive right . . . to discover, develop, make, have made, use, import, expert, distribute, market, promote, and otherwise offer for sale and sell" "any and all mouthguard based head impact sensing or monitoring system products . . . incorporating" eleven domestic and foreign patents identified in the Agreement.  Exh. A, p. 1, Recital No. 2; p. 2, ¶ 1.20; Schedule A.

13.    As consideration for the exclusive license and X2's anticipated contributions to the joint development agreement, Bite Tech agreed to make eight monthly advance royalty payments, each in the amount of $250,000.  Bite Tech also agreed to pay X2 50% of the post-

COMPLAINT- 3

expense income that Bite Tech received from sales of the BTX2 or any other products that were covered by the Agreement.

14.     At the time the Agreement was signed, X2 was in such dire financial straits that it could not have remained in business without the $2,000,000 advance royalty payments that Bite Tech agreed to make. Indeed, the very reason that the parties agreed to the advance royalty payments, as opposed to a more typical post-revenue royalty structure, was to infuse X2 with sufficient capital to remain in business so that the BTX2 could be developed and taken to market.

15.     After executing the Agreement, Bite Tech began expending significant time, money, and resources into developing and commercializing the BTX2.

16.     In June 2011, Bite Tech made the first of the eight $250,000 advance royalty payments and thereafter made each of the remaining scheduled payments. Bite Tech made the final advance royalty payment in January 2012.

17.     Sometime shortly after entering into the Agreement, X2 began to regret its terms and began to believe it could make more money if it were not obligated to license its technology exclusively to Bite Tech. X2 began exploring other business opportunities utilizing the technology that it exclusively licensed to Bite Tech in the Agreement. Believing that it could make more money if it were not bound by the terms of the Agreement, X2 began searching for ways to get out of its contract with Bite Tech. X2 did not disclose any of this to Bite Tech.

18.     X2 waited until after Bite Tech finished making the monthly advance royalty payments to terminate the Agreement. In March 26, 2012—less than two months after Bite Tech made the final advance royalty payment—X2 sent Bite Tech a letter purporting to terminate the Agreement. X2 purported to invoke section 7.3.2 of the Agreement, which allows the Licensor to terminate immediately if the Licensee becomes insolvent.

19.     X2 did not respond to Bite Tech's requests for evidence or explanation

COMPLAINT- 4

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

supporting its claim that Bite Tech was insolvent.

20.    X2 has refused to divulge the basis for its allegation that Bite Tech had become insolvent.

21.    Bite Tech was not insolvent when the Agreement was executed in May 2011, or when X2 purported to terminate the Agreement in March 2012, and it is not insolvent now.

22.    Bite Tech disputed and disputes the validity of X2's purported termination. Bite Tech also has demanded the return of the $2 million in advance royalty payments it paid to X2 prior to X2's improper termination.  X2 has stood by its termination and refused to return the $2 million to Bite Tech.

23.    Neither in the Agreement or elsewhere has Bite Tech licensed any of its intellectual property to X2.  Bite Tech is the owner of more than 45 US and foreign patents. Since its purported termination of the Agreement, X2 has misused Bite Tech's intellectual property.

## Claim I

### Breach of Contract- Wrongful Termination

24.    Bite Tech incorporates by reference the allegations in Paragraphs 1-23.

25.    Bite Tech and X2 entered into the Agreement on or about May 25, 2011.

26.    On March 26, 2012, X2 gave Bite Tech notice that it intended to terminate the Agreement pursuant to the insolvency provision found in 7.3 of the Agreement.

27.    As of the date of the notice and proposed termination, Bite Tech had not become insolvent and is not insolvent.

28.    Accordingly, X2 had no right to terminate the Agreement and its purported termination of the Agreement constitutes a breach of the Agreement.

29.    Bite Tech fully performed any and all terms, obligations, and conditions of the Agreement or was excused from such performance by X2's breach of the Agreement.

30.    As a direct and proximate result of X2's breach, Bite Tech has suffered and

COMPLAINT- 5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON  98101-2338
206.223.7000 FAX: 206.223.7107

1  will continue to suffer irreparable injury, loss of goodwill, loss of business opportunities, and

2  has incurred and will continue to incur damages in an amount to be proven at trial.

3  **Claim II**

4  **Breach of Contract- Violation of Exclusive License**

5         31.    Bite Tech incorporates by reference the allegations in Paragraphs 1-23.

6         32.    The Agreement provides Bite Tech "an exclusive worldwide license . . . under

7  which [Bite Tech] shall have the exclusive right . . . to discover, develop, make, have made,

8  use, import, expert, distribute, market, promote, and otherwise offer for sale and sell" "any

9  and all mouthguard based head impact sensing or monitoring system products . . .

10 incorporating" X2's "technology" as defined in the Agreement.

11        33.    The Agreement does not provide any residual right for X2 to "discover,

12 develop, make, have made, use, import, distribute, market, promote, [or] otherwise offer for

13 sale [or] sell" "any and all mouthguard based head impact sensing or monitoring system

14 products . . . incorporating" X2's technology.

15        34.    X2 has breached the Agreement by developing other mouthguard-based head

16 impact sensing and monitoring products incorporating the technology that X2 exclusively

17 licensed to Bite Tech.  X2 breached express and implied obligations imposed by the

18 Agreement, depriving Bite Tech of the fruits and benefit of the bargain of the Agreement.

19        35.    Bite Tech fully performed any and all terms, obligations, and conditions of the

20 Agreement or was excused from such performance by X2's breach of the Agreement.

21        36.    As a direct and proximate cause of this breach, Bite Tech has suffered and will

22 continue to suffer irreparable injury, loss of goodwill, loss of business opportunities, and has

23 incurred and will continue to incur damages in an amount to be proven at trial.

24 **Claim III**

25 **Breach of Contract- Failure To Collaborate On Development Of The BTX2**

26        37.    Bite Tech incorporates by reference the allegations in Paragraphs 1-23.

COMPLAINT- 6

999999.0020/5440669.1

38.    The Agreement required X2 to collaborate with Bite Tech in the development of the BTX2.  The Agreement also required X2 to use commercially reasonable efforts to research, develop, test, manufacture and commercialize the BTX2.  X2 failed to do these things.  Instead, X2 intentionally stymied the development of the BTX2.

39.    Bite Tech fully performed any and all terms, obligations, and conditions of the Agreement or was excused from such performance by X2's breach of the Agreement.

40.    As a direct and proximate cause of this breach, Bite Tech has suffered and will continue to suffer irreparable injury, loss of goodwill, loss of business opportunities, and has incurred and will continue to incur damages in an amount to be proven at trial.

## Claim IV

## Breach of Special Relationship

41.    Bite Tech incorporates by reference the allegations in Paragraphs 1-23.

42.    By entering the Agreement to jointly develop the BTX2 and other products contemplated by the Agreement, Bite Tech and X2 developed a special relationship of confidence and trust such that X2 had a duty to disclose facts that it knew may justifiably induce Bite Tech to act or refrain from acting.

43.    Prior to receiving some or all of the advance royalty payments, X2 formed an intent to terminate the Agreement and failed to disclose this fact to Bite Tech.

44.    X2 knew that Bite Tech's awareness of this fact would induce Bite Tech to act and/or refrain from acting by, among other things, not tendering some or all of the advance royalty payments and halting work on the BTX2 and other products contemplated by the Agreement.

45.    As a direct and proximate result of X2's concealment of its intent to terminate the Agreement, Bite Tech made all of the advance royalty payments and devoted substantial time, money, and resources to the development of the BTX2 and other products contemplated by the Agreement.

COMPLAINT- 7

46.    As a direct and proximate cause of this breach, Bite Tech has suffered and will continue to suffer damages in an amount to be proven at trial.

47.    Because X2's conduct was willful, wanton, and in conscious disregard of Bite Tech's rights, X2 is liable to Bite Tech for punitive and exemplary damages under applicable state law as governed by tort choice of law principles.

## Claim V

## Conversion

48.    Bite Tech incorporates by reference the allegations in Paragraphs 1-47.

49.    Between June 2011 and January 2012, Bite Tech made eight $250,000 monthly advance royalty payments totaling $2 million and did so because it reasonably believed that X2 intended to fulfill all of the terms of the Agreement.

50.    At the time of these payments, Bite Tech had a possessory and property interest in these funds.

51.    X2 accepted these payments with the knowledge that it intended to terminate the contract before the BTX2 could be commercialized and generate revenues for Bite Tech. Accordingly, some or all of the $2 million advance royalty payments were wrongfully received by X2.

52.    Bite Tech demanded the return of the advance royalty payments.  At the time of this demand, Bite Tech retained a property interest in the funds because they constituted an advance royalty payment under the Agreement.    X2 failed to return the funds, which constitutes a separate and additional conversion of the funds.

53.    Bite Tech has suffered and will continue to suffer irreparable injury, loss of goodwill, loss of business opportunities, and has incurred and will continue to incur damages in an amount to be proven at trial.

54.    Because X2's conduct was willful, wanton, and in conscious disregard of Bite Tech's rights, X2 is liable to Bite Tech for punitive and exemplary damages under applicable

COMPLAINT- 8

state law as governed by tort choice of law principles.

## Claim VI

### Common Law Restitution and Unjust Enrichment

55.    Bite Tech incorporates by reference the allegations in Paragraphs 1-54.

56.    At the time of the eight advance royalty payments, Bite Tech did not have full knowledge all of the facts at issue regarding the payments and the parties' relationship including, but not limited to, the fact that X2 intended to terminate the Agreement.

57.    By making the advance royalty payments, Bite Tech conferred a benefit on X2.

58.    By accepting the eight separate advance royalty payments, X2 had knowledge of the benefit conferred.

59.    Bite Tech made the advance royalty payments because it reasonably believed that it would have the opportunity to commercialize and monetize the BTX2 under the terms of the Agreement.  Bite Tech did not know and could not have known that X2 intended to terminate the Agreement upon receipt of the final advance royalty payment.

60.    Because Bite Tech did not have a full and fair opportunity to commercialize any products that were developed pursuant to the Agreement, it would be unjust if X2 were permitted to retain the $2 million advance royalty payment.  X2's acceptance and retention of the $2 million payment is unlawful and inequitable under the law and doctrines of restitution and unjust enrichment.

## Claim VII

### Trade Secret Misappropriation (RCW Ch.19.108)

61.    Bite Tech incorporates by reference the allegations in Paragraphs 1-60.

62.    In conjunction with its performance under the Agreement, Bite Tech disclosed valuable trade secrets to X2.  The trade secret information that was disclosed includes, but is not limited to, drawings, specifications, and diagrams of Bite Tech mouthguards, and other technical information not disclosed in Bite Tech's patents.

COMPLAINT- 9

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

63.    Bite Tech took reasonable steps to maintain the secrecy of this information and only disclosed it to X2 pursuant to the confidentiality provisions in the Agreement.

64.    This information is not a matter of common knowledge and not readily ascertainable by proper means and, for that reason, is valuable.

65.    X2 has misappropriated Bite Tech's trade secrets by using them in X2's development and marketing of impact-sensing mouthguards.

## DEMAND FOR JURY TRIAL

66.    Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Bite Tech prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it all available relief including, but not limited to:

a)    Judgment against X2 in an amount to be proved at trial;

b)    Pre-judgment interest at the statutory rate;

c)    Post-judgment interest at the statutory rate until the outstanding balance is paid in full;

d)    Costs incurred;

e)    Reasonable attorneys' fees and costs incurred pursuant to Section 8.1 of the Agreement and RCW Ch. 19.108.;

f)    Enjoining X2's unauthorized use of Bite Tech's trade secrets;

g)    Such other and further relief as the Court deems appropriate.

//
//
//
//
//

COMPLAINT- 10

999999.0020/5440669.1

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON  98101-2338
206.223.7000 FAX: 206.223.7107

DATED this 24th day of July at Seattle, Washington.

LANE POWELL PC



By: _____

Paul D. Swanson, WSBA No. 13656
By s/David C. Spellman
David C. Spellman, WSBA No. 13538
By s/Tiffany Scott Connors
Tiffany Scott Connors, WSBA No. 41740
Attorneys for Plaintiffs Bite Tech, Inc. and BTFM Holding, Inc.

Brett M. Schuman
Howard Holderness
MORGAN, LEWIS BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1126
Telephone: 415-442-1000
Facsimile: 415-442-1001
www.morganlewis.com
Counsel for Plaintiffs Bite Tech, Inc. and BTFM Holding, Inc. (*pro hac vice* applications forthcoming)

COMPLAINT- 11

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

# EXHIBIT A

## TECHNOLOGY LICENSE AGREEMENT

This TECHNOLOGY LICENSE AGREEMENT (this "**Agreement**"), dated as of May 25, 2011, is made by and between BITE TECH, INC., a Minnesota corporation ("**Licensee**"), and X2IMPACT, INC., a Washington corporation ("**Licensor**") (each herein referred to individually as a "**Party**", or collectively as the "**Parties**").  Defined terms used in this Agreement shall have the meanings set forth in Article 1.

### RECITALS

WHEREAS, Licensor has developed and owns rights to certain Technology; and

WHEREAS,  Licensor and Licensee desire to enter into an exclusive worldwide license pursuant to the terms of this Agreement under which Licensee shall have the exclusive right for the Term under the Patent Rights and Technology Rights to discover, develop, make, have made, use, import, export, distribute, market, promote and otherwise offer for sale and sell Products;

NOW, THEREFORE, in consideration of the mutual covenants and premises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensee and Licensor agree as follows:

### ARTICLE 1

### DEFINITIONS

As used in this Agreement, the following terms, whether used in the singular or plural, shall have the following meanings:

1.1     "**Advance Royalty**" has the meaning set forth in Section 3.1.1.

1.2     "**Advance Royalty Recovery Date**" means the date on which the aggregate Retained Amount for all Calendar Years equals the Advance Royalty.

1.3     "**Agreement**" has the meaning set forth in the Preamble.

1.4     "**Affiliates**" means any Person which directly or indirectly controls, is controlled by, or is under common control with a Party to this Agreement.  A Person shall be deemed to "control" another business entity if it owns, directly or indirectly, more than fifty percent (50%) of the outstanding voting securities, capital stock, or other comparable equity or ownership interest of such business entity, or exercises equivalent influence over such entity.

1.5     "**Bankruptcy Code**" has the meaning set forth in Section 7.3.3.

1.6     "**Bundled Product**" means a Product sold or bundled together with other products for a single price.

1.7     "**Calendar Quarter**" means the calendar quarters ending on March 31, June 30, September 30 and December 31 of each Calendar Year.

1.8     "**Calendar Year**" means each calendar year ending on December 31.

DB1/ 67279299.10

1.9    "**Change of Control**" means, with respect to a Party, (a) a sale, conveyance, or other disposition of all or substantially all of such Party's assets, (b) any merger, consolidation or other business combination transaction of such Party with or into another Person, in which the holders of the shares of voting capital stock of such Party outstanding immediately prior to such transaction continue to hold (either by such shares remaining outstanding or by their being converted into or sold or exchanged for shares of voting capital stock of the surviving entity) less than a majority of the total voting power represented by the shares of voting capital stock of such Party (or the surviving entity) outstanding immediately after such transaction, or (c) the direct or indirect acquisition (including by way of a tender or exchange offer) by any Person, or Persons acting as a "group" within the meaning of Section 13(d) of the Securities and Exchange Act of 1934, as amended, of beneficial ownership or a right to acquire beneficial ownership of shares representing a majority of the voting power of the then outstanding shares of capital stock of such Party.

1.10   "**Confidential Information**" means all information regarding a Party's business or affairs, including, without limitation, Technology (in the case of Licensor), business concepts, processes, methods, systems, know-how, devices, formulas, product specifications, software code, marketing methods, prices, customer or user information, customer or user lists, methods of operation, or other information, whether in oral, written, or electronic form, of the other Party designated as confidential or, that based on the circumstances, a reasonable person would know is confidential.

1.11   "**Exclusivity End Date**" has the meaning set forth in Section 7.1.2.

1.12   "**Force Majeure Event**" has the meaning set forth in Section 8.11.

1.13   "**Joint Inventions**" has the meaning set forth in Section 5.5.

1.14   "**Licensee**" has the meaning set forth in the Preamble.

1.15   "**Licensor**" has the meaning set forth in the Preamble.

1.16   "**Party**" or "**Parties**" has the meaning set forth in the Preamble.

1.17   "**Patent Rights**" means all patents and patent applications, including, without limitation, certificates of invention, applications for certificates of invention, and utility models, throughout the world, covering or relating to the Technology, including any substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations, or continuations-in-part, which Licensor owns or controls, as of the date of this Agreement and thereafter including, but not limited to, all current patents and patent applications listed in Schedule A.

1.18   "**Perpetual License Date**" has the meaning set forth in Section 7.1.

1.19   "**Person**" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority or natural person.

1.20   "**Product**" means any and all mouthguard based head impact sensing or monitoring system products for sports, military or medical purposes incorporating the Patent Rights or Technology Rights.

1.21   "**Product Income**" means the gross revenue actually received by Licensee on sales of Products, whether to independent third parties or Affiliates, less: (a) returns; (b) credits or allowances, if any, actually granted; (c) discounts actually allowed in the ordinary course; (d) freight, postage, and

insurance charges and additional special packaging charges; (e) customs duties, and excises, sales, or similar taxes or duties imposed upon and paid with respect to the sale of the Products; (f) any royalties payable to Under Armour, Inc., or any affiliate thereof, or any other third party; (g) sales, marketing and similar costs with respect to the sale of the Products other than compensation and associated overhead payable to Licensee's employees; and (g) costs of goods sold with respect to the Products. Notwithstanding anything to the contrary contained in this Agreement, Product Income shall not be diminished by sales of Products to an Affiliate or pursuant to other non-arm's length transactions, without the prior written consent of Licensor, not to be unreasonably withheld and using as a standard in such determination commercial reasonableness and the fairness of any such transaction. In the event that Licensor sells a Product as part of a Bundled Product, the Product Income with respect to such Product shall be determined by multiplying the Product Income of the Bundled Product by the fraction, A/(A+B) where A is the average sale price of the Product when sold separately, and B is the average sale price of the other product(s) in the Bundled Product sold separately, or by such other means as agreed by the Parties.

1.22 **"Product Royalty Percentage"** has the meaning set forth in Section 3.1.2.

1.23 **"Product Trademark"** and **"Product Trade Dress"** have the meanings set forth in Section 2.5.

1.24 **"Retained Amount"** means, in any Calendar Year, an amount equal to sixty-five percent (65%) of all additional Product Income after Licensor has been paid Royalties equal to three million dollars ($3,000,000) in that Calendar Year.

1.25 **"Royalties"** has the meaning set forth in Section 3.1.2.

1.26 **"Technology"** means any and all proprietary data, information, hardware, software, know-how, trade-secrets, copyrights, copyright applications, registrations and renewals in connection therewith, trademarks, service marks, processes, methods and materials related to mouthguard-based head impact sensing and/or monitoring systems for sports, military or medical systems.

1.27 **"Technology Rights"** means all legal rights (other than Patents Rights) throughout the world covering or relating to the Technology, which Licensor owns or controls as of the date of this Agreement and thereafter, whether patentable or otherwise, including, but not limited to, all trademarks, copyrights, copyright applications, and software items listed in Schedule A.

1.28 **"Term"** has the meaning set forth in Section 7.1.

## ARTICLE 2

## LICENSE

2.1 <u>License</u>. Licensor hereby grants to Licensee for the Term a worldwide, exclusive license under all of the Patent Rights and Technology Rights to make, have made, use, import, export, distribute, market, promote and otherwise offer for sale and sell Products, including, subject to Section 2.4, the right to sublicense any or all of such rights.

2.2 <u>Assistance</u>. Licensor shall provide Licensee with all assistance reasonably requested by Licensee, and not requiring any substantial out-of-pocket payment to third parties by Licensor, to enable Licensee to exploit the licenses granted in Section 2.1.

2.3    Collaboration.

2.3.1    The Parties shall collaborate on the design and functionality of the Products. Any Joint Invention resulting from such collaboration shall be jointly owned in accordance with Section 5.5.

2.3.2    The Parties shall strive for consensus with respect to all material decisions relating to the Products. In the event that any disagreement cannot be resolved within fifteen (15) days, the final decision related to the design of the Products or other Technology issues shall be made by Licensor, and the final decision for manufacturing, marketing or selling the Products will be made by Licensee, including, without limitation, as set forth in Section 2.5.

2.3.3    The Parties shall use commercially reasonable efforts to research, develop, clinically test, manufacture and commercialize the Products. Notwithstanding the foregoing, Licensor shall have no obligation in respect of payment relating to any manufacturing and commercialization, and Licensee shall have no obligation in respect of payment relating to research and development.

2.4    Sublicensing.  Licensee shall have the right for the purpose of obtaining manufacturing efficiencies and, subject to prior consultation with Licensor, for any other purpose reasonably consistent with the intent of this Agreement, and which does not defeat the intent of the Parties to work together to develop and commercialize the Products, to grant sublicenses of the licenses granted under Section 2.1 to third parties. Licensee will notify Licensor in writing of any proposed sublicense, which notice shall identify the proposed sublicensee and the purpose and terms of the sublicense.

2.5    Product Trademark and Product Trade Dress.  Licensee shall have sole discretion with respect to selecting trademarks and trade dress for use in connection with Products ("**Product Trademarks**" and "**Product Trade Dress**"); provided, however, the selection of Product Trademarks and Product Trade Dress shall not give Licensee any rights, other than those explicitly granted herein, in respect of Technology Rights and Patent Rights, and all rights in respect of the mark "X2" and any variant thereof shall remain with Licensor. As between the Parties, Licensee shall be the sole owner of any such Product Trademark and Product Trade Dress and all goodwill associated therewith, except with respect to such trademarks licensed pursuant to this Agreement and specifically listed in Schedule A. Licensor shall have no rights to market, promote, sell and/or distribute any product under the Product Trademarks or Product Trade Dress or any substantially similar trade names, trademarks or trade dress, nor undertake any actions that may negatively affect the value of the Product Trademarks or Product Trade Dress, except as may be permitted in advance in writing by Licensee.

## ARTICLE 3

## FEES AND ROYALTIES; REPORTS

3.1    Fees and Royalties.

3.1.1    In partial consideration for the licenses being granted to Licensee under this Agreement, Licensee shall pay to Licensor an advance royalty equal to two million dollars ($2,000,000) (the "**Advance Royalty**"), payable in eight equal monthly installments of two hundred fifty thousand dollars ($250,000). The first such installment shall be paid on June 1, 2011 and each subsequent monthly installment shall be paid on the first day of each subsequent month (or, if such day is a weekend or legal or bank holiday, on the next regular business day).

3.1.2    In further consideration of the licenses being granted to Licensee under this Agreement, Licensee shall pay to Licensor royalty payments ("**Royalties**") on all Product Income received by Licensee during each Calendar Year of the Term. All such Royalties are to be paid quarterly, within thirty (30) days after the close of each Calendar Quarter, and shall be an amount equal to fifty percent (50%) of all Product Income received by Licensee (the "**Product Royalty Percentage**"); provided, however, that until the Advance Royalty Recovery Date, during any Calendar Year in which Licensor has been paid Royalties equal to three million dollars ($3,000,000), the Product Royalty Percentage for the remainder of such Calendar Year shall be reduced to thirty-five percent (35%) of all Product Income received by Licensee. For avoidance of doubt, the Product Royalty Percentage shall be fifty percent (50%), and shall never be reduced, after the Advance Royalty Recovery Date, no matter when such Advance Royalty Recovery Date shall fall in the Calendar Year and notwithstanding any reduction in the Product Royalty Percentage that may have preceded the Advance Royalty Recovery Date at any time or in any Calendar Year.

3.2    Royalty Reports and Records.

3.2.1    Each payment of Royalties hereunder shall be accompanied by a report setting forth total Royalties payable to Licensor hereunder for the applicable Calendar Quarter and Licensee's calculation thereof.

3.2.2    Licensee shall keep accurate records in sufficient detail to enable the Royalties payable hereunder to be determined, showing with reasonable specificity each item relevant to the calculation of Royalties (the "**Records**").

3.2.3    Licensor shall have the right, once during each Calendar Year during the Term, to have an independent accountant inspect the Records at Licensor's expense, and if any such inspection reveals an error in payment of Royalties then the Party who has received the benefit of that error shall rectify it by payment to the other Party within thirty (30) days after the date of such inspection.

3.2.4    Licensee shall use commercially reasonable efforts to obtain the necessary consents to disclose to Licensor the provisions of its agreements with Under Armour, Inc., or any affiliate thereof, and Patterson Companies, Inc., or any affiliate thereof, that are or may become relevant for purposes of calculating Product Income. Such agreements and any other information disclosed pursuant to this Section 3.2.4 shall be Confidential Information under this Agreement.

3.3    Currency Conversion. All Royalties due on Product Income received by Licensee or any sublicensee in currency other than U.S. Dollars shall be paid to Licensor in U.S. Dollars at a rate of exchange for such other currency equal to one-half of the sum of (a) the exchange rate as reported in the Wall Street Journal for the first business day of the Calendar Quarter for which such Royalties are being paid, and (b) the exchange rate as reported in the Wall Street Journal for the last business day of the Calendar Quarter for which such Royalties are being paid. Such Royalties shall be without deduction for costs of exchange or collection or other similar charges.

3.4    Currency Exchange Control. If at any time legal restrictions prevent the prompt remittance of part or all of any Royalties, payment shall be made through such lawful means or methods as the Parties reasonably shall determine, the Parties agreeing to fully cooperate in effecting such remittance.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES

4.1     <u>Licensor Representations and Warranties</u>.  Licensor represents and warrants that:

4.1.1     It is in good standing under the laws of the jurisdiction of its incorporation, is qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification.

4.1.2     The execution, delivery and performance of this Agreement by Licensor have been duly authorized by all necessary corporate action and do not and will not (i) require any consent or approval of its stockholders nor (ii) to Licensor's knowledge, violate any law, rule, regulation, order, writ, judgment, decree, determination or award of any court, governmental body or administrative or other agency having jurisdiction over Licensor.

4.1.3     Licensor has full right and authority to enter into this Agreement and to grant the licenses to Licensee as herein described and is not a party to any agreement, indenture or other instrument and has no bylaw or charter provision which would prohibit it from entering into this Agreement or granting the licenses to Licensee hereunder.  This Agreement is a legal and valid obligation binding upon Licensor and enforceable in accordance with its terms.

4.1.4     The Patent Rights and Technology Rights do not infringe upon, dilute, misappropriate or otherwise come into conflict with, any rights of any third parties, and Licensee is not aware of any facts indicating a likelihood of the foregoing.  Licensor has never received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, dilution, misappropriation, or conflict.  To the knowledge of Licensor, no third party has interfered with, infringed upon, diluted, misappropriated, or otherwise come in conflict with, the Patent Rights or Technology Rights.

4.1.5     <u>Schedule A</u> identifies each patent or registration that has been issued to Licensor with respect to any Patent Rights and identifies each pending application or application for registration that Licensor has made with respect to any of the Patent Rights.  Licensor has not granted to any third party any license, sublicense, covenant not to sue, or other permission with respect to any of the Patent Rights or Technology Rights. <u>Schedule A</u> also identifies each registered trademark, copyright, copyright application, and software item (other than commercially available off-the-shelf software purchased or licensed for less than a total cost of $5,000 in the aggregate) with respect to the Technology Rights. Licensor has delivered to Licensee correct and complete copies of all patents, copyrights, registrations and applications and has made available to Licensor correct and complete copies of all other written documentation evidencing ownership and prosecution (if applicable) of each such item.

4.1.6     With respect to all Patent Rights and Technology Rights:

(a)     Licensor owns and possesses all right, title, and interest in and to such Patent Rights and Technology Rights, free and clear of any mortgage, lien, pledge, encumbrance, security interest, license or other restriction or limitation regarding access, use or disclosure;

(b)     The Patent Rights and Technology Rights are not subject to any outstanding injunction, judgment, order, decree, ruling, or charge;

(c)    no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or is threatened that challenges the legality, validity, enforceability, access, use, or ownership of such Patent Rights and Technology Rights, and to Licensor's knowledge there are no grounds for the same;

(d)    Licensor has never agreed to indemnify any Person with respect to any interference, infringement, dilution, misappropriation, or other conflict with respect to such Patent Rights and Technology Rights (except as required by law, or to the extent there are customary and usual indemnification provisions relating to and benefiting Licensor's officers, directors, employees and agents Licensor's articles of incorporation or bylaws); and

(e)    no loss or expiration of any such Patent Rights or Technology Rights is threatened, pending, or reasonably foreseeable, except for patents expiring at the end of their statutory terms.

4.1.7    Licensor has taken all necessary and desirable actions to maintain and protect all of the Patent Rights and Technology Rights and will continue to maintain and protect all of the Patent Rights and Technology Rights so as not to adversely affect the validity or enforceability thereof.

4.1.8    All employees or contractors of Licensor who have created or developed any Patents Rights and the Technology Rights have validly assigned to Licensor all of their intellectual property rights therein.

4.2    Licensee Representations and Warranties.  Licensee represents and warrants that:

4.2.1    It is in good standing under the laws of the jurisdiction of its incorporation, is qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification.

4.2.2    Licensee has full right and authority to enter into this Agreement and is not a party to any agreement, indenture or other instrument and has no bylaw or charter provision and knows of no law or regulation which would prohibit it from entering into this Agreement.  This Agreement is a legal and valid obligation binding upon Licensee and enforceable in accordance with its terms.

4.2.3    The execution, delivery and performance of this Agreement by Licensee have been duly authorized by all necessary corporate action and do not and will not (i) require any consent or approval of its stockholders nor (ii) to Licensee's knowledge, violate any law, rule, regulation, order, writ, judgment, decree, determination or award of any court, governmental body or administrative or other agency having jurisdiction over Licensee.

## ARTICLE 5

## INTELLECTUAL PROPERTY RIGHTS

5.1    Right of Licensee to Prosecute Applications.

5.1.1    Licensor agrees that during the Term, Licensor shall provide Licensee with copies of all communications to and from patent and copyright offices regarding applications or patents or copyrights relating to the Technology promptly after the receipt thereof. Copies of proposed communications to such patent or copyright offices shall be provided to Licensee in sufficient time before the due date in order to enable Licensor an opportunity to comment on the content thereof. Licensor shall

use reasonable efforts to incorporate any of Licensee's comments Licensor deems to have merit into any substantive communications. Licensor shall timely notify Licensee (but in no event less than thirty (30) days prior to the expiration of any priority rights period) if it intends not to seek patent protection on the Technology in any country, and Licensee shall have the right, at its expense and in Licensor's name, to file, prosecute, maintain, and enforce in such country patents relating to the Technology.

      5.1.2   In the event that Licensee wishes to manufacture, use, or make the Products in jurisdictions where Licensor has not yet obtained a patent, Licensee may, at its cost, apply for and register patents in such jurisdiction. Licensor shall own such patents in those areas.

      5.2   <u>Assistance</u>. Licensor shall provide to Licensee, and Licensee's authorized attorneys, agents, or representatives, reasonable assistance as necessary for Licensee to exploit its right under Section 5.1 to file, prosecute, maintain and enforce patent applications and patents. Licensor shall use its commercially reasonable best efforts to have signed all legal documents necessary to file, prosecute, maintain, and enforce patent applications or patents at no charge to Licensee, but the provisions of this Section shall not otherwise require Licensor to expend any substantive sums.

      5.3   <u>Infringement</u>.

      5.3.1   Each Party shall promptly report in writing to each other Party during the Term any: (i) known infringement or suspected infringement of any of the Patent Rights; or (ii) unauthorized use or misappropriation of the Technology Rights by a third party of which it becomes aware, and shall provide each other Party with all available evidence relating to said infringement, suspected infringement or unauthorized use or misappropriation. Within thirty (30) days after Licensor becomes, or is made, aware of any of the foregoing, it shall decide whether or not to initiate an infringement or other appropriate suit and shall advise Licensee of its decision in writing. The inability of Licensor to decide on a course of action within such thirty (30) day period shall for purposes of this Agreement be deemed a decision not to initiate an infringement or other appropriate suit.

      5.3.2   Within sixty (60) days after Licensor becomes, or is made, aware of any infringement, suspected infringement or unauthorized use or misappropriation by a third party, as provided in Section 5.3.1, and provided that Licensor shall have advised Licensee of its decision to file suit within the thirty (30) day period provided in Section 5.3.1, Licensor shall initiate an infringement or other appropriate suit anywhere in the world against such third party. Licensor shall provide Licensee with an opportunity to make suggestions and comments regarding such suit and shall promptly notify Licensee of the commencement of such suit. Licensor shall keep Licensee promptly informed of, and shall from time to time consult with Licensee regarding, the status of any such suit and shall provide Licensee with copies of all documents filed in, and all written communications relating to, such suit.

      5.3.3   Licensor shall select counsel for any suit referred to in Section 5.3.2 who shall be reasonably acceptable to Licensee. Licensor shall, except as provided below, pay all expenses of the suit, including, without limitation, attorneys' fees and court costs. Any damages, settlement fees or other consideration received as a result of such litigation shall be split equally between the Parties. If necessary Licensee shall join as a party to the suit but shall be under no obligation to participate except to the extent that such participation is required as the result of being a named party to the suit. Licensee shall have the right to participate and be represented in any suit by its own counsel at its own expense. Licensor shall not settle any aspect of such suit to the extent it involves rights of Licensee without obtaining the prior written consent of Licensee, which consent shall not be unreasonably withheld.

      5.3.4   In the event that Licensor does not inform Licensee of its intent to initiate an infringement or other appropriate suit within the 30-day period provided in Section 5.3.1, or does not

initiate such an infringement other appropriate action within the 60-day period provided in Section 5.3.2, Licensee shall have the right, at its expense, to initiate an infringement or other appropriate suit. In exercising its rights pursuant to this Section 5.3.4, Licensee shall have the sole and exclusive right to select counsel and shall pay all expenses of the suit, including, without limitation, attorneys' fees and court costs. Licensee shall be entitled to recover out of any damages, settlement fees or other consideration received as a result of such litigation first its actual out-of-pocket costs associated with such suit, and then any remaining recovery shall be split equally between the Parties. At Licensee's request, Licensor shall offer reasonable assistance to Licensee in connection therewith at no charge to Licensee. Without limiting the generality of the preceding sentence, Licensor shall cooperate fully in order to enable Licensee to institute any action hereunder. Licensor shall have the right to be represented in any such suit by its own counsel and such representation shall be at its own expense.

5.3.5    Each Party shall promptly report in writing to the other Party any known infringement or suspected infringement, unauthorized use or misappropriation of a Joint Invention that does not relate to any Patent Right or Technology Right by a third party of which it becomes aware, and shall provide the other Party with all available evidence relating to said infringement, suspected infringement or unauthorized use or misappropriation. Within sixty (60) days after a Party reports to the other Party such infringement, suspected infringement or unauthorized use or misappropriation by a third party, Licensor and Licensee shall jointly initiate an infringement or other appropriate suit anywhere in the world against such third party. If the Parties cannot agree on joint counsel or there exists a conflict of interest between Licensee and Licensor that cannot be waived, each Party shall have the right to participate and be represented in any suit by its own counsel. All expenses of the suit, including, without limitation, attorneys' fees and court costs, shall be paid equally by the Parties, and any damages, settlement fees or other consideration received as a result of such litigation, shall be split equally between the Parties; provided, however, that if one Party incurs a greater portion of out-of-pocket costs associated with such suit, such Party shall be entitled to recover out of any damages, settlement fees or other consideration received as a result of such litigation first such greater amount of out-of-pocket costs, and then any remaining recovery shall be split equally between the Parties.

5.4    Claimed Infringement.

5.4.1    In the event that a third party at any time provides written notice of a claim to, or brings an action, suit or proceeding against, a Party or any of its respective Affiliates or, in the case of Licensee, any of its sublicensees, claiming infringement of any intellectual property right, based upon an assertion or claim arising out of the development, manufacture, use or sale of Products, such Party shall promptly notify the other Party of the claim or the commencement of such action, suit or proceeding, enclosing a copy of the claim and/or all papers served. At the request of Licensee, Licensor shall provide to Licensee its advice regarding the technical merits of any such claim.

5.4.2    Licensor shall defend Licensee at Licensor's sole cost and expense, and will indemnify and hold harmless Licensee, from and against any and all claims, losses, costs, damages, fees and expenses arising out of or in connection with the infringement or alleged infringement by a Product of any United States or foreign patent, copyright, trade secret or other intellectual property right of any third party and any settlements relating thereto. Licensor shall have sole control and authority with respect to the defense or settlement of any such claim or action and Licensee shall cooperate with Licensor in the defense or settlement of any such claim or action, except that Licensor shall not enter into any settlement of any such claim or action without the consent of Licensee unless such settlement imposes no monetary or other liability or restriction on Licensee or its sublicensees, and provides for the unconditional release of Licensee from all liabilities and obligations in connection with such claim or action.

5.4.3    In addition to Licensor's obligation to indemnify and hold harmless Licensee, in the event that any Product becomes, or is likely to become, the subject of a claim of infringement of any United States or foreign patent, copyright, trade secret or other intellectual property right of any third party, Licensor shall either secure for Licensee the right to continue using the Product, or replace or modify the Product to make it non-infringing without material impairment of the function for which the Product was intended.

5.4.4    The provisions of Section 5.4.2 notwithstanding, Licensor shall not have any liability under Section 5.4.2 to the extent that any infringement or claim results from: (i) use of a Product in combination with some other product or formulation not supplied by Licensor where such Product itself would not be infringing; or (ii) modifications of a Product made solely by Licensee where such Product, if not modified by or for Licensee, would not be infringing.

5.4.5    If Licensee or any of its sublicensees, in order to operate under or exploit the licenses granted under Article 2 of this Agreement in any country, must, in Licensee's or its sublicensee's reasonable judgment, make payments to one or more third parties to obtain a license or similar right under a patent or other technology in the absence of which Products could not legally be developed, manufactured, used, marketed or sold in such country, such third party payments shall reduce and be set off against the Royalties otherwise due to Licensor. During the course of negotiations between Licensee or any of its sublicensees and such third party, Licensor shall render to Licensee and sublicensees reasonable assistance as necessary for Licensee or any of its sublicensees to secure such license or similar right. Licensee shall have the sole right to negotiate any such license or similar right, but Licensor shall be entitled to consent to the final terms of such license or similar right, which consent shall not unreasonably withheld, conditioned or delayed.

5.5    <u>Rights to Improvements and New Developments</u>.  Subject to Section 2.5, the Parties shall jointly own all rights, title and interest in or to any new discoveries or inventions made or first reduced to practice during the Term in connection with the development, manufacture or commercialization of Products (collectively, "**Joint Inventions**"). For clarity, Joint Inventions shall include, without limitation, any and all patent applications covering Joint Inventions that are filed by or on behalf of Licensor or Licensee at any time on or after the effective date of this Agreement and during the Term, and any and all granted patents that directly or indirectly result from such patent applications, or any divisions, continuations or continuations-in-part or other patent applications claiming priority thereto. Following the end of the Term, each Party shall have the right to practice and otherwise exploit the Joint Inventions on a standalone basis without the consent and without accounting to the other Party; provided, however, that this Section 5.5 shall not affect the provisions of Article 2 or Article 7 relating to the grant or the termination of the licenses to Patent Rights and Technology Rights granted under this Agreement.

## ARTICLE 6

## CONFIDENTIAL INFORMATION

6.1    <u>Treatment of Confidential Information</u>. Each Party hereto shall maintain the Confidential Information of the other Party in confidence, and shall not disclose, divulge or otherwise communicate such Confidential Information to others, or use it for any purpose, except pursuant to, and in order to carry out, the terms and objectives of this Agreement, and hereby agrees to exercise every reasonable precaution to prevent and restrain the unauthorized disclosure (except to the extent required to use or distribute Products) of such Confidential Information by any of its directors, officers, employees, consultants, subcontractors, sublicensees, or agents.

6.2    Release from Restrictions. The provisions of Section 6.1 shall not apply to any Confidential Information disclosed hereunder which:

6.2.1    was known or used by the receiving Party prior to its date of disclosure to the receiving Party, as evidenced by the prior written records of the receiving Party; or

6.2.2    either before or after the date of the disclosure to the receiving Party is lawfully disclosed to the receiving Party by sources other than the disclosing Party rightfully in possession of the Confidential Information; or

6.2.3    either before or after the date of the disclosure to the receiving Party becomes published or generally known to the public, other than through the sale of Products in the ordinary course, through no fault or omission on the part of the receiving Party or an affiliated party; or

6.2.4    is independently developed by or for the receiving Party without reference to or reliance upon the Confidential Information; or

6.2.5    is required to be disclosed by the receiving Party to comply with applicable laws, provided that the receiving Party provides prior written notice of such disclosure to the other party and takes reasonable and lawful actions to avoid and/or minimize the degree of such disclosure.

## ARTICLE 7

## TERMINATION

7.1    Term.

7.1.1    This Agreement and the licenses granted herein shall commence on the date hereof and shall continue in full force and effect until the earlier of December 31, 2016, or such earlier termination pursuant to this Section 7 (collectively, the "**Term**"); provided, however, that if Licensor has, within the Term, received Royalties of twenty-five million dollars ($25,000,000), from and after the date of such receipt (the "**Perpetual License Date**"), the licenses granted hereunder shall be perpetual and irrevocable.

7.1.2    In the event of a Change of Control of Licensor prior to the earlier of December 31, 2016 or the Perpetual License Date, the licenses granted hereunder shall continue until the fifth anniversary following the Exclusivity End Date and shall be on all of the same terms as the license granted herein; provided, however, if one or more of the Persons acquiring control in such Change of Control of Licensor is an actual or prospective competitor of Licensee or Under Armour, Inc., or any affiliate thereof, the licenses granted hereunder shall be deemed perpetual, irrevocable, fully paid and royalty free. For purposes of this Agreement, the "**Exclusivity End Date**" shall be (i) the third anniversary date of a Change of Control of Licensor, if such Change of Control occurs on or prior to December 31, 2013, or (ii) the second anniversary of a Change of Control of Licensor, if such Change of Control occurs after December 31, 2013. Following the Exclusivity End Date, the licenses granted hereunder shall continue until the fifth anniversary of the Exclusivity End Date, provided, however, that after the Exclusivity End Date, such licenses shall become non-exclusive.

7.1.3    If the Perpetual License Date or a Change of Control of Licensor has not occurred prior to December 31, 2015, the Parties agree to commence negotiations in good faith no later than June 30, 2016 for the renewal of this Agreement. If no Perpetual License Date or a Change of Control of Licensor has occurred and the Parties are unable to agree on the terms of such renewal, upon

expiration of the Term, Licensor shall grant Licensee a worldwide, non-exclusive license under all of the Patent Rights and Technology Rights to discover, develop, make, have made, use, import, export, distribute, market, promote and otherwise offer for sale and sell Products, all on the same terms as those set forth herein, for a period ending twelve (12) months from the effective date of such expiration or such longer period ending on the Advance Royalty Recovery Date.

7.2    Termination for Breach. Licensee shall be entitled to terminate this Agreement by written notice to Licensor in the event that Licensor shall be in default of any of its obligations hereunder and shall fail to remedy any such default within thirty (30) days after written notice thereof by Licensee. Licensor shall be entitled to terminate this Agreement by written notice to Licensee in the event that Licensee shall be in default of any of its obligations hereunder and shall fail to remedy any such default within thirty (30) days after written notice thereof by Licensor. Upon termination of this Agreement pursuant to this Section 7.2, the license granted herein and the Parties' rights and obligations in respect of one another shall (subject to Section 7.4 hereof) terminate, but no Party shall be relieved of any obligations incurred prior to such termination.

7.3    Right to Terminate for Insolvency or Bankruptcy.

7.3.1    Licensee may terminate this Agreement if Licensor becomes insolvent; or voluntary or involuntary proceedings are instituted against Licensor under any federal or state bankruptcy or insolvency laws, and are not dismissed within ninety (90) days of service of process upon Licensor; or Licensor makes an assignment or composition for the benefit of its creditors; or a receiver or custodian is appointed for Licensor and is not dismissed within ninety (90) days of such appointment; or Licensor's business is placed under attachment, garnishment or other process involving a significant portion of the business of Licensor and such process is not removed within ninety (90) days of being put in place; or Licensor fails to maintain operations as a going business for more than twenty (20) consecutive days.

7.3.2    Licensor may terminate this Agreement immediately by notice to Licensee, if Licensee becomes insolvent; or voluntary or involuntary proceedings are instituted against Licensee under any federal or state bankruptcy or insolvency laws, and are not dismissed within ninety (90) days of service of process upon Licensee; or Licensee makes an assignment or composition for the benefit of its creditors; or a receiver or custodian is appointed for Licensee and is not dismissed within ninety (90) days of such appointment; or Licensee' business is placed under attachment, garnishment or other process involving a significant portion of the business of Licensee and such process is not removed within ninety (90) days of being put in place; or Licensee fails to maintain operations as a going business for more than twenty (20) consecutive days.

7.3.3    All rights and licenses granted under or pursuant to this Agreement by Licensor to Licensee are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code (the **"Bankruptcy Code"**), licenses of rights to "intellectual property" as defined under Section 101 of the Bankruptcy Code. The parties agree that Licensee, as a licensee of such license rights under this Agreement, shall retain and may fully exercise all of its rights and elections under the Bankruptcy Code.

7.4    Survival of Obligations; Return of Confidential Information. Notwithstanding any termination of this Agreement, the obligations of the Parties with respect to Article 6, as well as any other provisions which by their nature are intended to survive any such termination, shall survive and continue to be enforceable. Upon any termination of this Agreement pursuant to Section 7.2, each Party shall promptly return to each other Party all written Confidential Information, and all copies thereof, of such other Party.

DB1/ 67279299.10                                    12

## ARTICLE 8

## MISCELLANEOUS

      8.1    <u>Governing Law</u>.  THE AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF WASHINGTON, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULES WHICH MAY DIRECT THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.  Both Parties hereby consent to the exclusive jurisdiction of the courts of the State of Washington for any claim brought by or on behalf of Licensee and the courts of the State of Connecticut for any claim brought by or on behalf of Licensor, and expressly waive any objections or defense based upon lack of personal jurisdiction or venue.  The prevailing Party shall be entitled to recover its costs and reasonable attorneys' fees incurred in connection with any action or proceeding between Licensor and Licensee arising out of or related to the Agreement.

      8.2    <u>Waiver</u>. The waiver by any Party of a breach or a default of any provision of this Agreement by any other Party shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of a Party to exercise or avail itself of any right, power or privilege that it has or may have hereunder operate as a waiver of any right, power or privilege by such Party.

      8.3    <u>Notices</u>. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified, (b) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (c) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the Parties at the respective address listed below or such other address as a Party shall have specified in a written notice actually received by the other Party.

|  |  |
|---|---|
| If to Licensee: | Bite Tech, Inc.<br>5 Edgewood Avenue, 3rd Floor<br>Greenwich, CT 06830<br>Attn: Lawrence V. Calcano |
| With a copy to:<br>(which copy shall<br>not constitute notice) | Morgan, Lewis & Bockius LLP<br>One Oxford Centre<br>Thirty-Second Floor<br>Pittsburgh, PA 15219<br>Attn:  Marlee S. Myers |
| If to Licensor: | X2Impact, Inc.<br>83 Columbia Street<br>Suite 400<br>Seattle, WA 98108<br>Attn:  Christoph Mack |
| With a copy to:<br>(which copy shall<br>not constitute notice) | Ryan, Swanson & Cleveland, PLLC<br>1201 Third Avenue,<br>Suite 3400<br>Seattle, WA 98101<br>Attn:  Michael Jay Brown |

8.4    <u>No Agency</u>. Nothing herein shall be deemed to constitute Licensee, on the one hand, or Licensor, on the other hand, as the agent or representative of the other, or as joint venturers or partners for any purpose. Neither Licensee, on the one hand, nor Licensor, on the other hand, shall be responsible for the acts or omissions of the other. No Party will have authority to speak for, represent or obligate the other Party in any way without prior written authority from such other Party.

8.5    <u>Entire Agreement</u>. This Agreement and the Schedule hereto (which Schedule is deemed to be a part of this Agreement for all purposes) contain the full understanding of the Parties with respect to the subject matter hereof and supersede all prior understandings and writings relating thereto. No waiver, alteration or modification of any of the provisions hereof shall be binding unless made in writing and signed by the Parties.

8.6    <u>Headings</u>. The headings contained in this Agreement are for convenience of reference only and shall not be considered in construing this Agreement.

8.7    <u>Severability</u>. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, the validity of the remaining provisions shall not be affected.

8.8    <u>Assignment</u>. No Party to this Agreement may assign its rights or obligations hereunder without the prior written consent of each other Party; provided, however, subject to Section 7.1.2, that each Party may assign its rights and obligations hereunder without the prior written consent of the other Party in connection with the sale of all or substantially all of the business or assets of the assigning Party.

8.9    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and permitted assigns.

8.10    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, which may be delivered by electronic transmission (including without limitation delivery facsimile copies of signatures via email in PDF or similar readily accessible format), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.11    <u>Force Majeure</u>. Failure of either Party to perform its obligations under this Agreement, except the obligation of Licensee to pay the Advance Royalty, shall be excused and shall not subject such Party to any liability to the other Party if such failure is caused by any cause beyond the reasonable control of such nonperforming Party, including acts of God, fire, explosion, flood, draught, war, riot, sabotage, embargo, strikes or other labor trouble, prohibitions against imports or exports of products developed, impossibility of obtaining raw materials or shortages in supply of raw materials, shortages in supply of Products, compliance with any order or regulation of any government entity acting with color of right, or public pronouncement of the United States or any agency thereof or of any foreign government or any agency thereof (each, a "**Force Majeure Event**"). Either Party claiming inability to perform or delay in performance due to any Force Majeure Event shall promptly notify the other Party of such inability and of the period for which such inability is anticipated to continue, and shall have the obligation to use reasonable efforts under the circumstances to attempt to cure such Force Majeure Event as promptly as possible.

8.12    <u>Expenses</u>. Each Party shall pay its own costs and expenses incurred with respect to the negotiation, execution, delivery and performance of this Agreement.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed in their names by their properly and duly authorized officers or representatives as of the date first above written.

**BITE TECH, INC.**

By: _____
Name: LAWRENCE V. CALCANO
Title: Chairman & CEO


**X2IMPACT, INC.**


By: _____
Name:
Title:

[Signature Page to Technology License Agreement]

27

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed in their names by their properly and duly authorized officers or representatives as of the date first above written.

**BITE TECH, INC.**

By:_____
Name:
Title

**X2IMPACT, INC.**

By:_____
Name: CHRISTOPH MACK
Title: PRESIDENT & CEO

[Signature Page to Technology License Agreement]

28

Schedule A

Patents, Patent Applications, and Other Technology

**United States Patent Applications**

1. Impact Sensing and Reporting System, U.S. provisional application number 61/336,429, filed January 22, 2010.

2. Aggregating and Analyzing Unwanted Head-Acceleration Data of a Plurality of Players, U.S. provisional application serial number 61/409,906, filed November 3, 2010.

3. Mouth Guard with Sensor, U.S. utility application serial number 13/009,505, filed 1/19/2011.

4. Mouth Guard Formation Methods, U.S. utility application serial number 13/009,580, filed 1/19/2011.

5. Communication System for Impact Sensors, U.S. utility application serial number 13/009,631, filed 1/19/2011.

6. Head Impact Event Reporting System, U.S. utility application serial number 13/009,663, filed 1/19/2011.

7. Head Impact Analysis and Comparison System, U.S. utility application serial number 13/009,686, filed 1/19/2011.

8. Head Impact Event Display, U.S. utility application serial number 13/009,704, filed 1/19/2011.

9. Headgear Position Sensor, U.S. provisional application serial number 61434,325, filed 1/19/2011.

**Foreign Patent Applications**

1. Mouth Guard with Sensor, PCT application number US2011/022220, filed January 24, 2011.

2. Head Impact Event Reporting System, PCT application number US 2011/022240, filed January 24, 2011.

**Trademarks**

1. X2, application to be filed.

2. X2IMPACT, application to be filed.